**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ERIN VOGEL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-6681 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| MCCARTHY BURGESS & | ) | |
| WOLFF, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Erin Vogel agreed to rent a car for two days. Thirty-seven days later, she returned the car, with a smashed side-view mirror. Returning a damaged rental car a month late can be expensive, as Vogel undoubtedly learned. But Vogel was surprised at the bill, which totaled more than $3,700. The rental car company provided an itemized invoice, but didn't explain the bill to her satisfaction. So Vogel paid only $681, a little more than she agreed to pay in the first place for the two-day rental.

Vogel eventually received a collection letter from a debt collector, Defendant McCarthy, Burgess & Wolff, Inc. ("MB&W"). The initial letter simply stated the total amount due, without breaking it down and itemizing the individual charges. That is, the letter gave the bottom-line number, without explaining how the rental car company tallied the fee. It included the same figure that gave Vogel sticker shock in the first place, less the $681 that she already paid.

So Vogel disputed the debt. MB&W responded by sending a second notice – a debt verification letter, confirming the total amount due. MB&W also provided a revised invoice from the rental car company that itemized the charges, just like the original invoice.

After receiving the second letter, Vogel decided to challenge MB&W's first letter under the Fair Debt Collection Practices Act. As the name suggests, the Fair Debt Collection Practices Act regulates the actions of debt collectors like MB&W. Among other things, it forbids them from using a "false, deceptive, or misleading representation or means" to collect debts. *See* 15 U.S.C. § 1692e. Vogel claims that MB&W's initial letter violated the Act because it stated the lump sum that she owed Payless ($3,036), but failed to break out the following three charges: "miscellaneous charges" of $789, a "late fee" of $385, and "optional services" of $582.75. She argues that the failure to break out those charges made the initial letter "false" as well as "deceptive or misleading."

The allegations of the complaint survived the pleading stage. The Court gave Vogel a chance to gather evidence that the initial collection letter from the debt collector improperly combined the debt with collection-related fees. Specifically, Judge Chang (this Court's predecessor before reassignment) gave Vogel a chance to uncover the facts and see if the letter included debt-collection fees.

But Vogel has come up short in discovery. There is no evidence that the debt collector gave Vogel an amount that surreptitiously included both debt and debt-collection charges. Instead, the line items in the invoice from Payless merely represent charges for Vogel's car rental, not add-on fees for collecting on the debt. The creditor told the debt collector that the debtor owed $X, so the debt collector told the debtor that she owed $X. That's not misleading.

The FDCPA did not require MB&W to itemize all of the components of the debt, unless the debt collector was combining debt and debt-collection-related fees. That's not the case here, so Vogel has no claim. MB&W's motion for summary judgment is granted.

2

## Background

Vogel rented a Toyota Yaris from Payless, and she planned to drive from Dallas to Chicago. *See* Rental Agreement (Dckt. No. 57-1, at 50). The original rental agreement envisioned a two-day rental, from November 6 to 8, 2016, for a total estimated cost of $592.22. *Id.*

For whatever reason, Vogel returned the car on December 13, 2016, more than a month late. *See* Rental Agreement Receipt (Dckt. No. 57-1, at 12). She never made it to Chicago – she returned the car in Dallas, after driving 222 miles in 37 days. *Id.* And worse yet, she returned the vehicle with a mangled side-view mirror. The record does not reveal why Vogel returned the car so late, or what happened to the ill-fated mirror.

But pictures of the side-view mirror are in the record. *See* Car Photographs (Dckt. No. 57-1, at 52–54). Suffice it to say that the mirror has seen better days. The exterior of the mirror is entirely smashed, if not gone altogether. The innards of the mirror are completely exposed. In fact, it's no longer a mirror at all – the reflective glass is gone, with only skeletal remains of wires and broken parts. It looks like it was on the wrong end of a baseball bat, or perhaps a cement wall.

The repair invoice reflects significant damage to the car's passenger-side mirror. *See* 1/10/17 Repair Order Invoice (Dckt. No. 57-1, at 51) (showing a repair cost of $404.54). And Vogel apparently didn't return the key, either. *See* Repair Order Invoice (Dckt. No. 57-1, at 51 of 178) ("NO KEY"). With no key, and an obliterated side-view mirror, Payless had the car towed at a cost of $116, presumably to get it fixed. *See* AB RENT-A-CAR Invoice (Dckt. No. 57-1, at 55 of 178) (detailing $16 in mileage charges and $100 for "HOOKUP" on the "1st TOW" on account of "NO KEY AND P. SIDE DAMAGE") (all caps in original).

3

Not surprisingly, the final cost for the 37-day rental was much higher than the original

two-day rental. In fact, the total bill ballooned to $3,717.88. *See* Payless Rental Receipt (Dckt.

No. 57-1, at 12). Putting that number in perspective, Vogel originally agreed to rent the car for

two days, for $592.22 (or $296.11 per day). In the end, the 37-day rental cost $3,717.88 (or

$100.48 per day).

Payless sent Vogel an invoice for $3,717.88. *See* Payless Invoice (Dckt. No. 98-1, at 2 of

2);[1] Pl.'s Resp., at ¶ 11 (Dckt. No. 82, at 3 of 8) ("Payless provided Plaintiff with an invoice

showing a balance due of $3,717.88."); *see also* Pl.'s Statement, at ¶ 6 (Dckt. No. 82, at 5 of 8)

("Plaintiff first learned of the debt when she received an invoice from Payless claiming she owed

$3,717.88.").[2]

The invoice broke down the components of the bill, so that Vogel could see how Payless

arrived at the number. Payless charged $844.98 for time and mileage. *See* Payless Invoice

(Dckt. No. 98-1, at 2 of 2). There were six types of "Taxable Fees," too, including

(1) miscellaneous charges of $789.00; (2) a concession recovery fee of $297.27; (3) a customer

---

[1] Based on the Court's review of the record, it appeared that the parties did not include the original invoice – meaning the invoice that Payless sent to Vogel, *before* MB&W got involved – in their summary judgment filings. To clear up the record, the Court ordered a supplemental submission. *See* 10/5/20 Order (Dckt. No. 97). The parties later filed the original invoice (Dckt. No. 98-1). The parties stipulated that it was a "true and accurate copy of the invoice sent to Plaintiff by Payless prior to MB&W's involvement in the collection of the debt." *See* Joint Statement and Stipulation, at ¶ 1 (Dckt. No. 98). The parties also filed the revised invoice that MB&W later sent with the Debt Verification Notice (Dckt. No. 98-2). The main difference between the two invoices is that the latter invoice shows a payment by Vogel totaling $681.05.

[2] Plaintiff combined two different documents – a response to Defendant's facts under Local Rule 56.1(b)(3)(B), and a statement of additional facts under Local Rule 56.1(b)(3)(C) – in a single filing. *See* Pl.'s Resp. to Def.'s Local Rule 56.1(a) Statement of Undisputed Material Facts and Plaintiff's Statement of Additional Material Facts (Dckt. No. 82). Combining the two documents in a single docket entry can create a little confusion when it comes to citations. The response contains 17 paragraphs, and the statement of additional facts contains 19 paragraphs. So, for example, citing "paragraph 6" can be confusing – *which* paragraph 6? For the sake of clarity, the Court will refer to the response as "Pl.'s Resp.," and will refer to the statement of additional facts as "Pl.'s Statement."

facility charge of $148.00 ($4 per day); (4) a transportation fee of $92.50 ($2.50 per day); (5) a vehicle license recoup fee of $74.00 ($2.00 per day); and (6) a late fee of $385.00. *Id.* The invoice also included "Optional Services" totaling $582.75, and a fuel service charge of $109.77. *Id.* All together, the total came to $3,717.88. *Id.*

Vogel was "surprised" by the high bill. *See* Pl.'s Statement, at ¶ 7 (Dckt. No. 82, at 5 of 8).[3] It appears that she called in late-February 2017 to complain: the record includes notes from her call with a Payless customer service representative. *See* Payless Customer Service Records (Dckt. No. 57-1, at 9). Vogel professed not to know why she was charged so much, claiming that she returned the car "on time" and that there were "no issues." *Id.* "Guest states that she's been charged $3000 for the rental and she would like to know why [it] is she's been charged this amount for the rental if she brought the vehicle back on time and there was no issues with it. Guest states that she would like to have this amount corrected."[4] *Id.*

Vogel's father later contacted Payless several times to figure out why the amount was so high. *See* Pl.'s Statement, at ¶ 7 (Dckt. No. 82, at 5 of 8). Her father didn't have any luck getting more information, and hit an impasse. *Id.* at ¶ 8. Vogel ultimately disputed the charge with her credit card company. *Id.*

Vogel paid some, but not all, of the tab. A later invoice from Payless (more on that later) shows that Vogel paid $681.05 towards her bill at some point, reducing the outstanding balance to $3,036.83. *See* Receipt (Dckt. No. 1-1, at 6 of 6) (referring to a "Payment"); *see also* Pl.'s Statement, at ¶ 13 (Dckt. No. 82, at 6 of 8). The parties don't reveal when she paid. But the key point is that the debt fell from $3,717.88 to $3,036.83 before the debt collector got involved.

---

[3] Defendant did not file a response to Plaintiff's Additional Material Facts, so they are deemed undisputed for purposes of the motion for summary judgment.
[4] The facts about the calls to Payless are not material to the Court's decision. But they are in the record, and the Court includes them as background only.

Payless referred the debt to MB&W, a debt collector.  *See* Pl.'s Statement, at ¶ 4 (Dckt. No. 82, at 5 of 8).  Payless retained MB&W to collect $3,036.83, the balance of the debt (after Vogel's payment of $681.05).  *See* Pl.'s Resp., at ¶ 5 (Dckt. No. 82, at 2 of 8) ("MB&W was retained to collect a debt in the amount of $3,036.83 owed by Plaintiff to Payless Car Rentals, Inc."); *id.* at ¶ 6 ("When the Account was placed with MB&W for collection on May 31, 2017, Payless represented to MB&W that the balance of Plaintiff's debt was $3,036.83.").

On June 2, 2017, MB&W sent Vogel a collection letter.  *Id.* at ¶ 8; Pl.'s Statement, at ¶ 9 (Dckt. No. 82, at 5 of 8); *see also* Initial Collection Letter, at 1 (Dckt. No. 1-1, at 2); Cplt. ¶ 17 (Dckt. No. 1).  The Initial Collection Letter identified Payless Car Rental as the creditor:  "This communication is from a debt collector.  This is an attempt to collect a debt and any information obtained will be used for that purpose.  Payless Car Rental, Inc. has placed the above referenced account with our office for collection activity."  *See* Initial Collection Letter, at 1.

The Initial Collection Letter reported that the "TOTAL DUE" was $3,063.83.  *Id.*  But the Initial Collection Letter did not itemize the charges.  That is, unlike the invoice from Payless, the letter did not explain how Payless arrived at that amount.  *See* Pl.'s Statement, at ¶ 10 (Dckt. No. 82, at 6 of 8); Initial Collection Letter, at 1 (Dckt. No. 1-1, at 2).  The letter simply reported the bottom-line number, without more.  *See* Initial Collection Letter, at 1.

Vogel responded by disputing the amount of the debt, following the procedure explained in MB&W's Initial Collection Letter.  *See* Pl.'s Statement, at ¶ 11 (Dckt. No. 82, at 6 of 8); *see also* Cplt. ¶ 18; Dispute Notification (Dckt. No. 69-3, at 25 of 131).

MB&W, in turn, sent Vogel a Debt Verification Notice on July 20, 2017.  *See* Debt Verification Notice (Dckt. No. 1-1, at 5–6 of 6).  Like the Initial Collection Letter, the first page of the Debt Verification Notice reported that the "Debt Amount" was $3,036.83.  *Id.* at 5.

With the Debt Verification Notice, MB&W also sent Vogel a revised invoice from Payless.[5]  *See* Receipt (Dckt. No. 1-1, at 6 of 6).  The revised invoice reflected a payment of $681.05 on the original bill of $3,717.88, leaving a remaining balance of $3,063.83.  *Id.*  Once again, the revised invoice itemized the charges.  For example, the revised invoice reflected "miscellaneous charges" of $789, a "late fee" of $385, and "optional services" of $582.75.  *Id.*; *see also* Cplt. ¶ 20; Pl.'s Statement, at ¶¶ 13–14 (Dckt. No. 82, at 6 of 8).

Vogel believed that these were improper "add-on" charges that "apparently inflated" her bill.  *See* Cplt. ¶¶ 21–22.  So she filed this lawsuit, arguing that MB&W violated the Fair Debt Collection Practices Act by failing to separately itemize these charges in its Initial Collection Letter.  *See* Cplt.  Vogel filed a single-count complaint, and advanced claims on behalf of a putative class.  Vogel has not yet moved for class certification.

MB&W filed a motion to dismiss, which the Court denied.  *See* 8/6/18 Order (Dckt. No. 34).[6]  The Court ruled that it was plausible – "at the pleading stage" – that presenting the total amount owed without a breakdown was misleading.  *Id.* at 5, 7.  The Court allowed discovery into whether the debt collector had "masked" individual components.  *Id.* at 4.  Now, with the benefit of facts gathered in discovery, the Court is in a better position to evaluate whether a reasonable jury could side in Vogel's favor.

---

[5]  The parties filed lots of copies of this revised invoice.  *See, e.g.*, Dckt. No. 1-1, at 6 of 6; Dckt. No. 57-1, at 12 of 178; Dckt. No. 69-3, at 26, 29 of 131; Dckt. No. 69-5, at 8, 11 of 29; Dckt. No. 69-7, at 14 of 180; Dckt. No. 75-1, at 8 of 37; Dckt. No. 82-5, at 13 of 13; Dckt. No. 82-6, at 12 of 41.  The most legible copy appears at Docket No. 98-2, at 2 of 2.  The parties stipulated that it was a "true and accurate copy of the invoice sent to Plaintiff by MB&W with the July 20, 2017 Debt Verification Notice."  *See* Joint Statement and Stipulation, at ¶ 2 (Dckt. No. 98).
[6]  The case was reassigned about a year later.

## Analysis

Rule 56 provides that the Court "shall grant" summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotations omitted).

The Court "'consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). The Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

MB&W moved for summary judgment, arguing that there is no evidence that the dunning letter was false, deceptive, or misleading. *See* Dckt. No. 68.

## I.     The Fair Debt Collection Practices Act

Congress enacted the FDCPA to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect

consumers against debt collection abuses." *See* 15 U.S.C. § 1692(e); *see also Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018) ("'The primary goal of the FDCPA is to protect consumers from abusive, deceptive, and unfair debt collection practices, including threats of violence, use of obscene language, certain contacts with acquaintances of the consumer, late night phone calls, and simulated legal process.'") (quoting *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1324 (7th Cir. 1997)).

At the outset, a debt collector must promptly notify the debtor of "the amount of the debt," among other things. *See* 15 U.S.C. § 1692g(a)(1). The amount doesn't have to be reduced to a judgment – the term "debt" includes an obligation and any "alleged" obligation. *Id.* at § 1692a(5). Likewise, the debt collector does not need to verify that the debt is valid. *See Walton v. EOS CCA*, 885 F.3d 1024, 1027–28 (7th Cir. 2018). Indeed, the FDCPA requires the debt collector to allow the debtor to dispute the validity of the debt. *See* 15 U.S.C. § 1692g(b). And while the debtor is disputing the debt, the debt collector cannot try to collect on it. *Id.*

The debt collector doesn't have to vouch for the debt's validity, but it cannot mislead the debtor about the debt, either. The statute forbids "any false, deceptive, or misleading representation or means" to collect debts. *See* 15 U.S.C. § 1692e. The statute then gives a non-exhaustive list of specific examples that violate that general proscription. Specifically:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> . . .
>
> (2) The false representation of--
>
> > (A) the character, amount, or legal status of any debt; or

(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

. . .

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

*Id.*

To determine whether a particular debt collector's communication is "false, deceptive, or misleading" under § 1692e, the Court uses an objective standard. The question is not whether Vogel was, in fact, deceived or misled (at least when the plaintiff only seeks statutory damages, as is the case here). *See Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1083 (7th Cir. 2013); *Muha v. Encore Receivable Mgmt., Inc.*, 558 F.3d 623, 629 (7th Cir. 2009). Instead, the Court considers the effect of the disputed language on a hypothetical "unsophisticated debtor." *See Johnson v. Enhanced Recovery Co., LLC*, 961 F.3d 975, 982 (7th Cir. 2020); *Heredia v. Capital Mgmt. Servs., L.P.*, 942 F.3d 811, 815 (7th Cir. 2019); *Pantoja v. Portfolio Recovery Assocs., LLC*, 852 F.3d 679, 686 (7th Cir. 2017).

The unsophisticated debtor is neither an expert nor a fool. "Our hypothetical unsophisticated debtor is 'uninformed, naive,' and 'trusting,' but does possess 'rudimentary knowledge about the financial world,' and 'is wise enough to read collection notices with added care.'" *Johnson*, 961 F.3d at 982 (quoting *Boucher v. Fin. System of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018)); *Heredia*, 942 F.3d at 815; *Pantoja*, 852 F.3d at 686. "She is also 'capable of making basic logical deductions and inferences' and possesses 'reasonable intelligence.'" *Johnson*, 961 F.3d at 982 (quoting *Heredia*, 942 F.3d at 815); *Pantoja*, 852 F.3d at 686. "The 'unsophisticated consumer' isn't a dimwit." *Wahl v. Midland Credit Mgmt., Inc.*, 556 F.3d 643, 645 (7th Cir. 2009). "Though 'our unwary debtor may tend to read collection

letters literally, he does not interpret them in a bizarre or idiosyncratic fashion.'" *Johnson*, 961

F.3d at 982 (quoting *Heredia*, 942 F.3d at 815). "Applying this standard, the issue is whether the

dunning [debt collection] letter could well confuse a substantial number of recipients." *Pantoja*,

852 F.3d at 686 (cleaned up).

The Seventh Circuit has divided § 1692e cases into three groups based on the level of

deception (or truthfulness). In rough terms, debt collection letters fall into three camps: (1) not

misleading, (2) possibly misleading, or (3) misleading.

In the first category, the language is "obviously not misleading" and "no extrinsic

evidence is required" to prove the point. *See Johnson*, 961 F.3d at 982. The second group

includes language that is not facially deceptive or misleading, "but could be construed so as to be

confusing or misleading to the unsophisticated consumer." *Id.* In that case, a plaintiff cannot

defeat a motion for summary judgment "without producing extrinsic evidence, such as consumer

surveys, tending to show that unsophisticated consumers are in fact confused or misled by the

challenged language." *Id.* at 983; *see also Pantoja*, 852 F.3d at 686–87; *Lox v. CDA, Ltd.*, 689

F.3d 818, 822 (7th Cir. 2012). In the last category, the language is "plainly false, deceptive, or

misleading, and therefore requires no additional evidence for the plaintiff to succeed on her

claim." *Johnson*, 961 F.3d at 983; *see also Janetos v. Fulton Friedman & Gullace, LLP*, 825

F.3d 317, 323 (7th Cir. 2016).

In other words, if the answer is obvious, there is no need for extrinsic evidence.

Sometimes the face of a letter is all the Court needs to decide if it is misleading. But in a

borderline case, when it is up in the air whether a letter is misleading, the plaintiff must come

forward with evidence showing actual confusion by unsophisticated consumers.

11

Here, Vogel has not provided any extrinsic evidence that unsophisticated debtors are in fact confused by the language in MB&W's Initial Collection Notice. So unless the language is plainly false, deceptive, or misleading, MB&W is entitled to summary judgment.

## II.     Itemization and the FDCPA

The Initial Collection Letter from MB&W stated the amount of the debt in one lump sum: $3,036.83. But it did not break down the debt into its component parts. That is, the letter did not separately itemize certain charges, including $789 in "miscellaneous charges," a $385 "late fee," and $582.22 for "optional services." *See* Initial Collection Letter, at 1 (Dckt. No. 1-1, at 2 of 6). It simply gave the final tab.

Vogel claims that MB&W violated the Act by providing the aggregate amount of the debt, without itemizing the separate amounts. Vogel argues that the Initial Collection Letter "was misleading because the lack of itemization meant that Vogel could not knowledgably assess the validity of the balance." *See* Pl.'s Opp. to Mtn. for Summ. Judgment, at 6–7 (Dckt. No. 83). So the issue is whether the Fair Debt Collection Practices Act required the debt collector to provide the debtor with an itemized breakdown of the debt in the initial letter.[7]

### A.     The Text of the Statute

"Statutory interpretation, as we always say, begins with the text." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). The Act prohibits a debt collector from using any "false, deceptive, or misleading representation or means" when collecting a debt. *See* 15 U.S.C. § 1692e. In

---

[7] An astute reader may remember that Vogel already received an itemized bill from the rental car company. But that invoice from the creditor does not let the debt collector off the hook. The question is whether the debt collector deceived the debtor, and "an unsophisticated consumer may have lost the bill and forgotten the amount of the debt completely." *Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562, 566 (7th Cir. 2004).

particular, the debt collector cannot make a "false representation of – (A) the character, amount, or legal status of any debt." *Id.* at § 1692e(2)(A).

On its face, the FDCPA does not require debt collectors to break down the bill, and itemize the component parts one by one. One can imagine a statutory requirement that debt collectors must deliver an itemized bill, and thus make it easy for debtors to see how the creditor arrived at the number. But the Act doesn't impose an overarching duty on debt collectors to do whatever would be helpful to debtors. It simply prohibits them from collecting debts in a "false, deceptive, or misleading" manner. *See* 15 U.S.C. § 1692e. The FDCPA does not require a debt collector to become the debtor's keeper.

The Act *does* require debt collectors to disclose *some* information to the debtors. For example, a neighboring provision requires a debt collector to "send the consumer a written notice containing (1) the amount of the debt." *See* 15 U.S.C. § 1692g(a)(1). The text refers to "the amount" – *singular* – of the debt, without requiring a breakdown. *Id.*

The reference to the aggregate "amount" of the debt, without more, suggests that giving the bottom-line number is sufficient. *Id.* Nothing in the statute requires a debt collector to itemize the component parts of that "amount." *Id.* It requires "the amount," not the subparts. *Id.*

Nearby statutory text recognizes that the amount can have component parts. The Act prohibits the "collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation)" unless "such amount" is authorized by agreement or permitted by law. *See* 15 U.S.C. § 1692f(1). Congress knew how to divide a debt into component parts when it wanted to. But when prohibiting misleading statements, the text merely refers to "the . . . amount" of the debt as a whole, without slicing and dicing the amount into separate pieces. *See* 15 U.S.C. § 1692e(2)(A).

In addition to the "amount" of the debt, the statute lists other information that debt collectors must provide to debtors. The "initial written communication" with the consumer must "disclose" that the "debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." *See* 15 U.S.C. § 1692e(11). Also, a debt collector must give the debtor written notice of the "name of the creditor," and (if requested) the "name and address of the original creditor." *See* 15 U.S.C. § 1692g(a)(2), (5). The debt collector also must make a "statement" about what will happen if the debt is, or is not, disputed by the debtor. *See* 15 U.S.C. § 1692g(a)(3), (4).

But the text does not require the debt collector to explain to the debtor how the creditor tallied the amount of the debt. The affirmative duty to provide *some* information suggests that there is no comparable duty to provide *other* information, such as the back-up for the "amount" of the debt. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 233 (2011) ("It seems that the statute fails to mention design-defect liability 'by deliberate choice, not inadvertence.' . . . *Expressio unius, exclusio alterius*."); *Refined Metals Corp. v. NL Indus. Inc.*, 937 F.3d 928, 932 (7th Cir. 2019) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (citation omitted); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107–11 (2012).

The text does prohibit debt collectors from saying or doing anything that is "false, deceptive, or misleading." *See* 15 U.S.C. § 1692e; *see also id.* at § 1692e(10) (prohibiting the "use of any false representation or deceptive means to collect or attempt to collect any debt"). But on its face, there was nothing false, deceptive, or misleading about MB&W's letter. Payless believed that Vogel owed $3,717.88, and after a payment of $681.05, the remaining balance was

14

$3,036.83.  The collection letter stated that Vogel owed $3,036.83, the same amount that Payless said that she owed before the debt went into collection.  Payless told MB&W that Vogel owed $X, so MB&W told Vogel that she owed $X.

There was nothing "false, deceptive, or misleading" about telling Vogel the total amount owed, without breaking it down.  The letter did not deceive her about the amount of the debt, or mislead her in any way.  It simply gave her the final tab.  There was nothing deceptive about telling Vogel what she owed.

The text of the statute also includes specific prohibitions, to illustrate the general prohibition against "false, deceptive, or misleading" conduct.  *Id*. at § 1692e.  In particular, the Act prohibits misrepresentations about "the character, amount, or legal status of any debt."  *Id*. at § 1692e(2)(A).  But based on the record at hand, Vogel has come up empty.

MB&W did not misrepresent the "amount" of the debt.  *Id.*  The amount of the debt was not "false."  *Id.* at § 1692e(2)(A).  Payless said that Vogel owed $3,036.83, so MB&W told Vogel that she owed $3,036.83.  The debt collector didn't add interest, or attorneys' fees, or a penalty, or any other additional charges.  It simply stated what she owed, according to the creditor.  The debt collector added no hidden fillers.

The "amount" of the debt does not mean the *basis* for the debt.  *See Amount*, The American Heritage Dictionary of the English Language (1979)[8] ("The total of two or more quantities; aggregate"); *Amount*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (same).  The "amount" refers to the size of the debt, not how the debt got there in the first place.  "How much is the bill?" does not mean "what's the bill *for*?"

---

[8]  Congress amended the statute and added this provision in 1977, hence the citation to a dictionary from the 1970s.  Even so, the definition of "amount" has not changed, as the more recent dictionary shows.

MB&W did not misrepresent the "legal status" of the debt, either. *Id.* at § 1692e(2)(A). The letter stated that the debt was owed to Payless, which had "placed" the debt with MB&W "for collection activity." *See* Initial Collection Letter, at 1 (Dckt. No. 1-1, at 2). The letter made clear that MB&W took no position on whether the debt was valid, and offered Vogel an opportunity to "dispute the validity of this debt." *Id.* And the letter did not suggest that the debt had been reduced to a judgment. *Id.*

MB&W also did not misrepresent the "character" of the debt. *Id.* at § 1692e(2)(A). MB&W did not lard the debt with charges of its own, and then present a bill with hidden fees from the debt collector. Instead, Payless told MB&W that Vogel owed $3,036.83, so MB&W told Vogel that she owed $3,036.83. The character of the debt was the charge for returning the (late, damaged) rental car.

The "character" of a debt concerns the "kind of obligation" owed by the debtor: *e.g.*, a secured or unsecured debt, a judgment debt, a subordinated debenture, etc. *See Rhone v. Med. Bus. Bureau, LLC*, 915 F.3d 438, 440 (7th Cir. 2019). If a debt is made up of different types of obligations, the debt collection notice must itemize them separately: "[k]eeping these kinds of obligation distinct reduces the potential for confusion about their nature and relative priority." *Id.*

Here, the Initial Collection Letter made it clear that Vogel owed the debt to Payless, and MB&W was merely collecting on that debt. *See* Initial Collection Letter, at 1 (Dckt. No. 1-1, at 2) ("Payless Car Rental, Inc. has placed the above referenced account with our office for collection activity."). Vogel has unearthed no evidence that any part of the "total due" reported in the Initial Collection Letter consisted of different "kinds of obligation." *See Rhone*, 915 F.3d

16

at 440. There is no evidence that some of Vogel's debt was secured and some unsecured, or some reduced to judgment and some not.

Vogel complains about vague statements in the Payless invoice, meaning the "miscellaneous charges," "late fee," and "optional services." *See* Cplt. ¶ 20; Rental Agreement Receipt (Dckt. No. 57-1, at 12). Collection fees and attorneys' fees related to debt collection have a different "character" from debts incurred for goods and services, and must be itemized separately in any debt collection notices. *See Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562, 565–66 (7th Cir. 2004); *Acik v. I.C. Sys., Inc.*, 640 F. Supp. 2d 1019, 1024–25 (N.D. Ill. 2009).

But there is no evidence in the record that those fees arose out of MB&W's efforts to collect on Vogel's debt. In fact, Vogel has not come forward with evidence about what, exactly, those fees relate to. All of the itemized charges that Vogel complains about were listed in Payless's original invoice, *before* Payless contracted MB&W to collect on the debt. *See* Payless Invoice (Dckt. No. 98-1, at 2 of 2). Those parts of the debt existed before debt collection, suggesting they have nothing to do with compensating MB&W for collecting on the debt.

Indeed, a review of the contractual documents suggests that these charges arose out of Vogel's car rental – not MB&W's debt collection. The "late fee" most likely refers to a fee for returning the car 35 days late. *See* Rental Terms and Conditions, at 1 (Dckt. No. 57-1, at 14 of 178) ("If you return it earlier or later, a different or higher rate may apply and, if returned later, you may be charged a late return fee.").

The "optional services" refers to supplemental liability insurance. Vogel agreed to pay "Supplemental Liability Insurance" when she rented the car, at a cost of $15.75 per day. *See* Rental Agreement (Dckt. No. 57-1, at 50). That's consistent with the invoice. Under the heading "Your Optional Products/Services," the receipt refers to "SLI" – Supplemental Liability

17

Insurance – and then says "Accepted." *See* Receipt (Dckt. No. 1-1, at 6). The invoice refers to the daily price ("15.75"), and then offers a total for "Optional Services" of $582.75. *Id.* That's 37 days, at $15.75 per day.

The "miscellaneous charges" of $789.00 represent the most opaque line item. But the Payless Rental Terms and Conditions state that "You'll pay all charges that apply to the rental for *miscellaneous services* and, where permitted, airport facility fees and/or concession recovery fees, and vehicle license recovery fees, other fees and surcharges." *See* Rental Terms and Conditions, at 2 (Dckt. No. 57-1, at 15 of 178) (emphasis added). Within the same section heading, the document describes possible charges for redeeming coupons or vouchers, cleaning the car's interior, removing smoking odors, replacing missing keys, and paying tolls. *Id.* If "miscellaneous charges" can include replacing missing keys (and there was a missing key here), presumably they can include replacing a missing side-view mirror, too.

Whether these charges were proper under the rental agreement between Payless and Vogel is beside the point. This is not a breach of contract action, or declaratory judgment action construing the rental agreement. The important thing is that the charges arise from the Payless car rental, not from MB&W's debt collection efforts.

If Vogel had come forward with evidence that Payless was attempting to collect a debt *plus* prospective fees and costs for debt collecting (as in *Fields*), Vogel would have a claim. But after months of discovery, Vogel has come up short. Simply put, Vogel has come forward with no evidence that the Initial Collection Letter combined an underlying debt with the expenses of debt collecting.

18

B.    **The Case Law**

Vogel cites cases for the notion that a debt collector must itemize any charges that "have not been liquidated in the underlying agreement." *See* Pl.'s Opp., at 5 (Dckt. No. 83); *id.* at 5–8. By "not . . . liquidated in the underlying agreement," the Court understands Vogel to mean that the contract between the creditor and the debtor does not state these charges as a specific dollar figure (or at least as a rate from which the debtor could easily predict the charges based on the contract). For example, there is no apparent way to arrive at the $789 in "miscellaneous charges" simply by referencing the Payless Rental Agreement and Terms and Conditions. So Vogel argues that the FDCPA cases say that debt collectors must itemize such "non-liquidated" charges.

Vogel over-reads the cases. They stand for the more limited proposition that debt collectors must itemize any *collection-related* fees, including attorneys' fees. *See Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562, 565–66 (7th Cir. 2004) (failure to itemize attorneys' fees); *Acik v. I.C. Sys., Inc.*, 640 F. Supp. 2d 1019, 1023–25 (N.D. Ill. 2009) (failure to itemize collection fee); *Dowdy v. Solutia Healthcare TAS, Inc.*, 2006 WL 3545047, at *8–9 (M.D. Tenn. 2006) (same); *see also Simkus v. Cavalry Portfolio Servs., LLC*, 12 F. Supp. 3d 1103, 1111 (N.D. Ill. 2014) (holding that debt collectors need not itemize interest and principal, while noting that debt collectors must "itemize[] how the total amount due was tallied if the demand included added-on expenses, 'like attorneys' fees or collection costs'") (quoting *Fields*, 383 F.3d at 565). None of these cases apply here. Vogel has turned up no evidence that the "total due" in MB&W's Initial Collection Letter included collection-related fees.

In *Fields*, the creditor sent the debtor an invoice for $122.06 for services at an animal hospital. *See Fields*, 383 F.3d at 563. The pet owner didn't pay, so a debt collector got

19

involved. *Id.* The debt collector then sent the debtor a letter stating that the "ACCOUNT BALANCE" was $388.54. *Id.* The letter did not reveal that that amount included $250 for attorneys' fees for collecting the debt. *Id.*; *see also id.* at 566. The letter demanded "more than double the original obligation" – $388.54 instead of $122.06 – without any explanation, and without any disclosure that the amount owed included debt-collection-related fees. *Id.* at 566 ("Nowhere did Wilber explain that it was seeking attorneys' fees of $250."). "It would be difficult for such a consumer to understand how a relatively modest fee for services rendered had tripled in size." *Id.*

The Seventh Circuit noted that debt collectors must "clearly and fairly communicate" information about the amount of the debt to debtors. *Id.* at 565. That duty includes "how the total amount due was determined," with a caveat: "*if the demand for payment includes add-on expenses like attorneys' fees or collection costs*." *Id.* (emphasis added).

That's a big "if." Nothing in *Fields* suggests that debt collectors must figure out and disclose how the creditors calculated the original debt in the first place. So, in *Fields*, there was no need to figure out if the $122.06 in the original invoice included, say, the costs of shampooing a dog, plus a fee for picking up the dog late, or something else. What mattered was not the amount of the original debt, but the undisclosed add-ons for *collection* fees.

The Seventh Circuit has endorsed this reading of *Fields*. In *Singer v. Pierce & Assocs., P.C.*, 383 F.3d 596 (7th Cir. 2004), the Seventh Circuit held that the debt collector complied with *Fields* by "segregat[ing] the attorneys' fees from the underlying debt in an itemized list of expenses, thus avoiding a § 1692e or § 1692f violation." *Singer*, 383 F.3d at 598. *Singer* summarized *Fields* as requiring the itemization of attorneys' fees, not the itemization of all of the parts of the principal debt. *Id.* (explaining that *Fields* "hold[s] that it is misleading under the

FDCPA to lump attorneys' fees in with the principal debt as part of an account balance in a dunning letter"). More recently, in *Degroot v. Client Servs.*, 2020 WL 5951360 (7th Cir. Oct. 8, 2020), the Seventh Circuit described *Fields* as addressing an "itemized breakdown" when there are "additional other charges," meaning collection charges above and beyond what the consumer "has in fact incurred." *Id.* at *4. The problem in *Fields* was the failure to disclose "how the debt in question had doubled in size due to fees and other charges" from debt collecting. *Id.*

The Second Circuit recently confirmed that the FDCPA does not require debt collectors to itemize the component parts of the principal debt. *See Kolbasyuk v. Capital Mgmt. Servs., LP*, 918 F.3d 236, 239–42 (2d Cir. 2019). Providing a bottom-line number does not misrepresent the "amount of the debt" under section 1692g(a)(1). *Id.* at 240 ("Nothing in Section 1692g required [the debt collector] to inform [the debtor] of the constituent components of that debt or the precise rates by which it might later increase."). And declining to provide a "precise breakdown" of the debt does not mislead unsophisticated consumers under section 1692e. *Id.* at 242. "A failure to provide the additional detailed disclosures that [the debtor] seeks does not transform [the debt collector's] otherwise-straightforward letter into a 'false, deceptive, or misleading' one." *Id.* (quoting 15 U.S.C. § 1692e).

District courts have reached the same conclusion. "[N]othing in the statutory text of the FDCPA requires a debt collector to itemize the debt being collected." *Fike v. Portfolio Recovery Assocs., LLC*, 2020 WL 5747811, at *2 (W.D. Pa. 2020); *see also Muldowney v. Merit Recovery Sys., Inc.*, 2019 WL 2024760, at *4 (N.D.N.Y. 2019) ("Nor has plaintiff provided or the Court discovered any statutory language or precedent requiring that a debt collection letter contain a date of service or an itemization of the balance. Though such specifics would certainly be helpful to a debtor, the lack thereof is not a *per se* violation of the FDCPA."); *Humphreys v.*

21

*Budget Rent A Car Sys. Inc.*, 2017 WL 6497285, at *6 (E.D. Pa. 2017) ("[T]here is no general duty to itemize under the FDCPA, and such a requirement cannot be read into an otherwise unambiguous and precise statute."); *Wilson v. Trott Law, P.C.*, 118 F. Supp. 3d 953, 963 (E.D. Mich. 2015) ("[T]here is no language in the FDCPA that requires a debt collector to provide a complete breakdown of the debt owed."); *Moran v. Green & Cooper Attorneys LLP*, 43 F. Supp. 3d 907, 914 (S.D. Ind. 2014) ("A debt collector need not 'itemize' the debt, so long as its statement of the total is clear an accurate."); *Meier v. Law Offices of Weltman, Weinberg, & Reis Co., LPA*, 2011 WL 2039113, at *7 (W.D. Pa. 2011) ("[T]he Court finds no merit to Plaintiff's argument that Defendant violated the FDCPA by failing to itemize the amounts due and how they increased over time."); *Scioli v. Goldman & Warshaw P.C.*, 651 F. Supp. 2d 273, 281 n.15 (D.N.J. 2009) ("To be clear, the Court does not hold that a debt collector *must* itemize the fees and costs it seeks in order to comply with the FDCPA.").

Vogel points to no case – within the Seventh Circuit or otherwise – holding that a debt collector must itemize ordinary charges that a consumer has rung up for goods and services with a particular creditor. If anything, the current of Seventh Circuit case law flows in the other direction. Debt collectors do not need to break down the debt by separating principal and interest. *See Hahn v. Triumph Partnerships LLC*, 557 F.3d 755, 756–57 (7th Cir. 2009); *see also Wahl v. Midland Credit Mgmt., Inc.*, 556 F.3d 643, 646 (7th Cir. 2009). If a debt collector does not need to separate principal and interest, then there is no apparent reason why a debt collector must separate different parts of the principal.

This case is more similar to *Hahn* than to *Fields*. *Field*s involved a debt *plus* fees for debt collecting. But *Hahn* involved two different components of the debt (principal and interest).

Here, Payless sent a letter about the overall debt, without including any fees for debt collecting. The debt collector simply reported the amount of the debt, without more.

If they choose, debt collectors can break out the amounts due from different transactions by listing individual debts as separate line items. *See Rhone v. Med. Bus. Bureau, LLC*, 915 F.3d 438 (7th Cir. 2019). In *Rhone*, the Seventh Circuit held that a debt collector could list nine debts of $60 each, instead of reporting a single lump-sum total of $540. *Id.* at 439–40. "We can imagine a regulation specifying whether debts to a single creditor should be aggregated (or perhaps reported by singly and in the aggregate) – consistency contributes to clarity – but Rhone does not point to such a regulation, nor could we find one." *Id.* at 439. "[W]hether amounts due for individual purchases from a single merchant are stated separately or as a total" does not change their character. *Id.* at 440. Separating the transactions "does not affect the genesis, nature, or priority of the debt and so does not concern its character." *Id.*

The flipside is true, too. Under the statute, it makes no difference whether a debt collector breaks out the principal into separate line items, or reports the principal as a lump sum owed by the debtor. "A dollar due is a dollar due." *Hahn*, 557 F.3d at 757.

Vogel believes that an itemized letter from the debt collector would have helped her assess the validity of the debt. *See* Pl.'s Opp. to Mtn. for Summ. Judgment, at 6–7 (Dckt. No. 83). But "[d]unning letters can comply with the Fair Debt Collection Practices Act without answering all possible questions about the future." *See Koehn v. Delta Outsource Group, Inc.*, 939 F.3d 863, 865 (7th Cir. 2019); *Degroot v. Client Servs.*, 2020 WL 5951360 (7th Cir. Oct. 8, 2020) (noting that the "mere raising of an open question" does not make a letter misleading). A dunning letter can comply with the FDCPA without answering all possible questions about the past, too.

As the name itself suggests, the Fair Debt Collection Practices Act addresses the *fair collection* of a debt, not the *validity* of that debt. Remember: the text requires the debt collector to truthfully report the amount of the debt claimed by the creditor, "whether or not such obligation has been reduced to judgment" or is merely "alleged" by the creditor. *See* 15 U.S.C. § 1692a(5) (definition of "debt"); *see also id.* at § 1692e(2)(A) (prohibiting debt collector from misrepresenting the "amount . . . of any debt"). The FDCPA declines to invade the ken of contract law to determine the rights and responsibilities of Vogel and Payless under their rental agreement. Instead, the FDCPA is focused on policing *MB&W's* truthfulness in conveying the state of play to Vogel.

Vogel's theory of the case sits uncomfortably with the Seventh Circuit's admonition that the Act focuses on unscrupulous *debt collectors*, not unscrupulous creditors. "It would be both burdensome and significantly beyond the Act's purpose to interpret § 1692g(b) as requiring a debt collector to undertake an investigation into whether the creditor is actually entitled to the money it seeks. Section 1692g(b) serves as a check on the debt-collection agency, not the creditor." *See Walton v. EOS CCA*, 885 F.3d 1024, 1027–28 (7th Cir. 2018). A debt collector does not have an obligation to double-check the creditor's books. And there is no wide-ranging duty to give the debtor whatever information would be helpful to challenge the debt.

Vogel has not come forward with a workable limiting principle that would tell debt collectors when they've itemized enough to avoid liability (under her interpretation of the statute). She proposes that debt collectors must itemize charges that "have not been liquidated in the underlying agreement." *See* Pl.'s Opp., at 5 (Dckt. No. 83). How, exactly, is a debt collector supposed to know which charges are "liquidated" by the creditor-debtor agreement, and which are not? Vogel's interpretation would impose enormous burdens on debt collectors (thus making

debt more costly), by pressing them into service to explore the basis for a debt owed by a debtor. Nothing in the statutory text suggests that the FDCPA commandeered debt collectors into the service of double-checking each creditor's charges. *See Walton v. EOS CCA*, 885 F.3d 1024, 1027–28 (7th Cir. 2018).

Under the undisputed facts, MB&W's Initial Collection Letter is not misleading on its face. The creditor told her that she owed $3,036.83, and the debt collector told her that she owed $3,036.83. That wasn't false, deceptive, or misleading. Vogel has come forward with no extrinsic evidence, so there is no basis in the record to let the claim survive. *See Johnson*, 961 F.3d at 982. No jury could find that the letter would mislead an unsophisticated debtor.[9]

**Conclusion**

The Court grants Defendant MB&W's motion for summary judgment.

Date: October 19, 2020 _____

Steven C. Seeger
United States District Judge

---

[9] As MB&W faces no FDCPA liability, the Court declines to address the Defendant's bona fide error defense.